UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

P. MICHAEL KOTASEK

                    Plaintiff,

                                        **REPORT AND RECOMMENDATION**
                                        **06-CV-0619 (FJS)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

# Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, I recommend that the matter

be dismissed.

# Background

2.      Plaintiff P. Michael Kotasek challenges the Administrative Law Judge's ("ALJ")

determination that he is not entitled to Disability Insurance Benefits ("DIB") or Child

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former Commissioner Jo Anne B. Barnhart as the defendant in this action.

Insurance Benefits, under the Social Security Act ("the Act").[2]  Plaintiff alleges that he was disabled from August 1, 1984, because of depression, panic attacks, anxiety disorders, agoraphobia[3], and back pain.  In denying Plaintiff's claim, the ALJ found that during the time period in question, Plaintiff was able to perform various sedentary jobs, and therefore, was not entitled to DIB, Child Insurance Benefits, or Supplemental Security Income ("SSI")[4] (R. at 26).[5]  Plaintiff has met the disability insured status requirements of the Act at all times up until December 31, 2001.

## Procedural History

3.     Plaintiff filed for DIB, SSI, and Children's Insurance Benefits on October 25, 2002 (R. at 48-49, 50-52, 290-293).  All claims were denied (R. at 37-41, 294-296).  Following a hearing, the ALJ issued a decision on November 23, 2004, in which he found that Plaintiff had not met the requirements for disability (R. at 16-27).  Plaintiff's request for review by the Appeals Council, on January 27, 2005, was denied (R. at 4-5A, 6).

4.     On May 19, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB[6] to

---

[2] In his complaint, Plaintiff only appeals the ALJ's decision denying DIB (Dkt. No. 1, p. 2).  However, in his brief, Plaintiff makes mention of the fact that Child Insurance Benefits were also denied.  See Plaintiff's Brief, p. 3.  Thus, this Court will assume that Plaintiff is also appealing that denial as well.
[3] [Agoraphobia is an] abnormal fear of being helpless in a situation from which escape may be difficult or embarrassing that is characterized initially often by panic or anticipatory anxiety and finally by avoidance of open or public places.  See http://www.merrian-webster.com/dictionary/agoraphobia.
[4] Plaintiff is not appealing the SSI decision.
[5] Citations to the underlying Administration are designated as "R."
[6] See note 2.

Plaintiff for the period beginning August 1, 1984.[7]  Defendant filed an answer to

Plaintiff's complaint on August 31, 2006, requesting the Court to dismiss Plaintiff's

complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's

Brief") on October 16, 2006.  On November 30, 2006, Defendant filed a Memorandum

of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on

the Pleadings[8] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full

briefing, the Court deemed oral argument unnecessary and took the motions under

advisement.

## Facts

### Medical Examiners

#### *Dr. Chisdak and Dr. Kwoh*

5.      On February 19, 1993, Plaintiff saw Dr. Chisdak[9] after a skin lesion on his

forearm was biopsied and indicated sarcoidosis[10] (R. at 154).  After examining Plaintiff's

x-ray, Dr. Chisdak diagnosed sarcoidosis, but noted that Plaintiff was "essentially

clinically asymptomatic" (R. at 155).  Plaintiff returned to Dr. Chisdak four months later,

on June 21, 1993 (R. at 152).  Dr. Chisdak diagnosed stable or slightly worsened

"[s]arcoidosis with significant pulmonary involvement."  Id.  Dr. Chisdak also diagnosed

"[n]ew onset polyuria."[11]  Id.  Treatment notes also indicate that Plaintiff's calcium level

---

[7] The ALJ's January 6, 2005, decision became the Commissioner's final decision in this case when the
Appeals Council denied Plaintiff's request for review.
[8] Although no motion for judgment on the pleadings was filed, the moving party was excused from such
filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings
as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"
[9] The record indicates that Dr. Chisdak specializes in pulmonary medicine (R. at 155).
[10] "[A] chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by
hard tubercles.  It can affect almost any organ or tissue…" *Dorland's Illustrated Medical Dictionary*, 1693
(31st ed. 2007).
[11] "[T]he passage of a large volume of urine in a given period."  *Dorland's* at 1516.

was elevated and Dr. Chisdak began 30 mg. of Prednisone[12] to combat Plaintiff's

hypercalcemia. [13]  Id.   Dr. Chisdak again saw Plaintiff on July 22, 1993 (R. at 151).

Because Plaintiff's calcium level was in the normal range, Dr. Chisdak began lowering

Plaintiff's Prednisone to 20 mg. and eventually 10 mg.  Id.

On October 1, 1993, Plaintiff saw Dr. Kwoh[14] for a second opinion concerning his

sarcoidosis (R. at 127).  Dr. Kwoh diagnosed mild sarcoidosis which was under control

through the use of corticosteroids[15] (R. at 128).  Dr. Kwoh recommended that Plaintiff

continue treatment with Dr. Chisdak[16] as Dr. Kwoh concurred with the treatment and Dr.

Chisdak's location was more convenient for Plaintiff (R. at 128-129).

Dr. Chisdak saw Plaintiff several times between September 19, 1993 and March

3, 1994, with little to no change in either his sarcoidosis or hypercalcemia except to

occasionally raise or lower his daily intake of Prednisone (R. at 131-150).  Dr. Chisdak

also noted a "probable right shoulder bursitis,"[17] on May 31, 1994, and prescribed

Naprosyn[18] (R. at 146).  On February 27, 1995, Plaintiff began tapering off the

Prednisone because his calcium levels had repeatedly been normal (R. at 143).

Between May 30, 1995 and May 7, 2001, Plaintiff saw Dr. Chisdak eight times

with little change (R. at 130-142).  Plaintiff was never put back on Prednisone as his

calcium levels were always within normal limits, albeit borderline at times.  Id.

---

[12] An anti-inflammatory or immunosuppressant.  *Dorland's* at 1531.
[13] "[A]n excess of calcium in the blood."  *Dorland's* at 899.
[14] The record does not specifically state Dr. Kwoh's specialty, however, it suggests he is a rheumatologist or immunologist as he is an Assistant Professor of Medicine for the University of Pittsburgh Medical Center in the rheumatology and clinical immunology department (R. at 127, 129)
[15] An anti-inflammatory. *Dorland's* at 429.
[16] Dr. Kwoh recommended Plaintiff continue to see Dr. Cisdak, but it is clear from the record that Dr. Kwoh meant Dr. Chisdak (R. at 128)
[17] Inflammation of a bursa: "a sac or saclike cavity filled with a viscid fluid."  *Dorland's* at 269,
[18] Trademark for naproxen sodium, an anti-inflammatory.  *Dorland's* at 1251.

*Dr. Hare*

Psychologist Nathan Hare, Ph.D., saw Plaintiff regularly from June, 1984 until January 20, 2004 (R. at 171-229, 279-286).  In Plaintiff's intake form, he stated that he suffered from a social phobia that developed into agoraphobia (R. at 229).  In 1984, Dr. Hare began by working with Plaintiff on various visual techniques to control his social phobias (R. at 227).  From late 1984 through 1985, Plaintiff showed increased self-confidence and social functioning and a general decrease in anxiety (R. at 227-220).  Plaintiff also mentioned that he had been taking trips to Syracuse in February 1986 (R. at 221).  In June 1986, Dr. Hare began discussing the need to lower Plaintiff's medications.[19]  Id.  Also in June 1986, Plaintiff began focusing on issues with his parents.  Id.  In the next several months, Plaintiff continued to discuss his parents as well as his career issues (R. at 220).  From September 1986 through 1987, Dr. Hare noted a general decrease in anxiety, some progress in Plaintiff's career and his relationships, but Plaintiff continued to have problems with his family (R. at 220-218).  In March 1988, Dr. Hare noted that Plaintiff had found a part time job which made him feel better (R. at 218).  From July 1988 through February 1989, Dr. Hare and Plaintiff worked on Plaintiff's self-definition, his ability to break free from his parents, his need to find a job, and his general independence (R. at 218-217).  In April 1989, Plaintiff expressed his wish to move to New York City, which was causing some anxiety (R. at 217).  From May 1989 through August 1989, Plaintiff discussed his relationships, his goal to find a bartending job, and the need to cut down on his medication (R. at 216).  In

---

[19] Dr. Hare does not state what medication Plaintiff is taking (R. at 221).

September 1989, Dr. Hare noted that Plaintiff had a recent crisis in which he felt

trapped.  Id.  From October 1989 through June 1990, Plaintiff discussed his desire to

return to school and to move out, his relationship problems with his girlfriend, and also

the need to decrease his medication (R. at 216-213).

In July 1990, Dr. Hare noted an increase in Plaintiff's anxiety due to his career

and girlfriend problems, but Plaintiff was doing better by July 1990 (R. at 212).  From

February 1991 through June 1991, Plaintiff discussed various issues, including

problems with meeting his life goals, where he fits in, his parents, moving out, returning

to school, and a general depression for which medication was suggested (R. at 210-

207).  Beginning in July 1991, Dr. Hare noted that Plaintiff appeared to be doing better

(R. at 207).  In October and November 1991, Plaintiff continued to discuss issues with

his parents and his wish to find a part-time job (R. at 206).  In December 1991, Plaintiff

had a joint session with his parents to discuss their expectations of him and also to

encourage their support (R. at 205).  Dr. Hare noted a decrease in depression in

February 1992 (R. at 205).  From March 1992 through January 1993, Plaintiff continued

to discuss issues with his parents and his career, and also his concerns that he might

be gay (R. at 204-202).  On February 1, 1993, Plaintiff revealed a childhood memory

involving a sexual encounter with a family member (R. at 202).  From February 1993

through August 1993, Dr. Hare and Plaintiff continued to discuss Plaintiff's life goals and

his parents (R. at 201-200).  In September 1993, Dr. Hare noted that Plaintiff's mood

was improved (R. at 199).  Plaintiff continued to improve, despite some minor setbacks,

through June 1996 (R. at 199-191).  Plaintiff did not see Dr. Hare again until April 1997

(R. at 190).

In April 1997, Dr. Hare noted that Plaintiff was doing well, with no great anxiety (R. at 190).  Beginning in September 1997, Plaintiff again discussed his issues with his parents (R. at 190).  In February 1998, Dr. Hare noted an increase in depression (R. at 189).  On November 4, 1998, Dr. Hare wrote a letter requesting Plaintiff be excused from jury duty (R. at 188).  From March 1999 through November 2000, Dr. Hare noted an increase in independence and an overall improvement (R. at 187-184).  Dr. Hare noted an increase in depression and anxiety in January and March 2001 (R. at 183, 182).  Plaintiff complained of a sexual problem in March 2001 and a change of medication to Serzone[20] was discussed (R. at 182).  Dr. Hare believed Plaintiff was doing somewhat better on the Serzone in July 2001, but noted an increase in anxiety in August 2001 (R. at 180-179).  From August 28, 2001 through January 2002, Dr. Hare found Plaintiff was improving (R. at 178-175).  In January 2002, Plaintiff complained of a sexual problem from the medication and Dr. Hare suggested a trial of Wellbutrin[21] (R. at 175).  From March 2002 through December 2002, Dr. Hare found Plaintiff to be doing better (R. at 174-171, 286).  Dr. Hare noted an increase in depression in January 2003 and increased anxiety in June and October 2003 (R. at 285, 283).  By the end of October 2003 Plaintiff was doing better and Dr. Hare noted an increase in self-confidence (R. at 279).  Dr. Hare's treatment notes ended in January 2004 (R. at 279).

On March 11, 2004, Dr. Hare completed a medical assessment of ability to do work-related activities (R. at 287-289).  Dr. Hare found that Plaintiff had a good ability to follow work rules, a seriously limited ability to relate to co-workers, deal with the public,

---

[20] Trademark for nefazodone hydrochloride, an antidepressant.  Drugs.com, *Serzone* (2008), http://www.drugs.com/serzone.html; *Dorland's* at 1255.
[21] Trademark for bupropion hydrochloride, an antidepressant.  *Dorland's* at 2107, 265.

and interact with supervisors, and a good ability to use judgment (R. at 287).  Dr. Hare

opined that Plaintiff was seriously limited in his ability to deal with work stresses but had

a fair ability to function independently and maintain attention/concentration (R. at 288).

Also, Dr. Hare opined that Plaintiff had a fair ability to understand, remember and carry

out complex job instructions, detailed but not complex job instructions, and simple job

instructions.  Id.  Finally Dr. Hare found that Plaintiff had a good ability to maintain his

personal appearance, a fair ability to behave in an emotionally stable manner, and a

seriously limited ability to relate productively[22] in social situations and demonstrate

reliability (R. at 289).  Dr. Hare also noted that Plaintiff "has a severe social anxiety

[and] tends to become anxious [and] disorganized under stress" and "become[s]

anxious … in new situation[s] and when under stress" (R. at 288).

*Dr. Cook*

Plaintiff saw Dr. Cook on May 2, 2001, for back pain as well as anxiety and

depressive disorders (R. at 162).  Dr. Cook opined that Plaintiff's pain was

musculoskeletal in nature and recommended that Plaintiff continue taking 500 mg. of

Relafen.[23]  Id.  Plaintiff was on 200 mg. of Serzone, but reduced that to 100 mg.

because of the side effects.  Id.

Plaintiff saw Dr. Cook again on July 31, 2001, for back pain (R. at 160).  Dr. Cook

recommended that Plaintiff continue with the Relafen and physical therapy.  Id.  Dr.

Cook also recommended that Plaintiff continue with 50 mg. of Serzone, because

Plaintiff had no side effects at that level.  Id.

---

[22] The statement reads "relate productably in social situations" (R. at 278).  It is assumed that the writer meant "productively."
[23] Trademark for nabumetone, an anti-inflammatory.  *Dorland's* at 1645, 1248.

Plaintiff saw Dr. Cook on February 22, 2002, for a cold (R. at 158).  Dr. Cook diagnosed Plaintiff with an upper respiratory infection and prescribed 250 mg. of Ceftin[24] for 10 days and a nasal spray.  Id.  Also, Dr. Cook changed Plaintiff's medication from Zoloft[25] to Wellbutrin at Dr. Hare's suggestion.

On April 26, 2002, Plaintiff again saw Dr. Cook (R. at 156).  Dr. Cook stated that greater than fifty percent of the session was spent counseling Plaintiff.  Id.  Plaintiff stated there was improvement with the Wellbutrin.  Id.  Dr. Cook also renewed Plaintiff's Xanax[26] prescription.  Id.

Dr. Cook completed a medical assessment of ability to do work-related activities on April 4, 2003 (R. at 276-278).  Dr. Cook opined that Plaintiff had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors (R. at 276).  Dr. Cook also opined that Plaintiff had a poor or no ability to deal with work stresses, had a fair ability to function independently, and was seriously limited in his ability to maintain attention/concentration (R. at 277).   Dr. Cook opined that Plaintiff had a fair ability to understand, remember and carry out complex job instructions, a fair ability to understand, remember and carry out detailed, but not complex job instructions, and a good ability to understand, remember and carry out simple job instructions.  Id.  Finally, Dr. Cook found that Plaintiff had a fair ability to maintain his personal appearance, a seriously limited ability to behave in an emotionally

---

[24] Trademark for cefuroxime axetil, an antibiotic *Dorland's* at 317.
[25] Trademark for sertraline hydrochloride, a "serotonin reuptake inhibitor."  *Dorland's* at 2120, 1724.
[26] Trademark for alprazolam, an anti-anxiety agent.  *Dorland's* at 2113, 55.

stable manner, a seriously limited ability to relate productively[27] in social situations, and a fair ability to demonstrate reliability (R. at 278).

### Independent Medical Examiners

On December 11, 2002, Plaintiff met with Independent Medical Examiner ("IME") Mary Ann Moore, Psy.D., for psychiatric evaluation at the request of the Social Security Administration ("SSA") (R. at 287). Dr. Moore found that Plaintiff's voice was clear, but that he quivered at times (R. at 239). Dr. Moore diagnosed Plaintiff with Axis I, panic disorder with agoraphobia and dysthymic[28] disorder (R. at 241). Dr. Moore opined that Plaintiff had a fair to guarded prognosis, given that he had steady treatment with Dr. Hare for twenty years and continued to have panic attacks daily. Id. Dr. Moore completed a medical source statement ("MSS") and found that Plaintiff

> could follow and understand simple directions and instructions, perform simple tasks under supervision, and complete some simple tasks. He did generally show an intact memory and concentration, although anything that he does is done very very slowly and very hesitantly. He is easily overwhelmed by stress. He generally can show poor decision-making abilities, withdrawing, and remaining free from any social interactions. He has [a] great deal of difficulty relating with groups of people (R. at 240-241).

On December 12, 2002, Plaintiff met with IME Dr. Datta, for an internal medicine examination at the request of the SSA (R. at 230). Dr. Datta noted that Plaintiff was currently taking .5 mg of Xanax, 150 mg. of Wellbutrin, and 100 mg. of Zoloft. Id. Dr. Datta diagnosed Plaintiff with sarcoidosis, which was in remission, improved left thigh pain, and a long history of depression and anxiety (R. at 233). Dr. Datta completed an

---

[27] See n. 16.
[28] Mild depression. *Dorland's* at 590.

MSS and found that Plaintiff "has no limitations with his speech, vision, or hearing.
There are no limitations with upper extremities for fine and gross motor activities.  There
are no limitations with sitting, standing, walking, or climbing.  Mild restrictions for heavy
lifting and carrying."  Id.

**RFC Analysis**

On January 24, 2003, P.A. Spearman, Ph.D., completed a psychiatric review
technique at the request of the SSA, based on Plaintiff's medical records from Dr. Hare
(R. at 243-256).  Dr. Spearman diagnosed Plaintiff with the following "not severe"
impairments: depression as well as anxiety and agoraphobic problems (R. at 243, 246,
248).  Dr. Spearman found that Plaintiff had a mild restriction of daily living activities,
mild difficulties in maintaining social functioning, and mild difficulties in maintaining
concentration, persistence or pace, but never had repeated episodes of deterioration of
extended duration (R. at 253).

Also on January 24, 2003, Dr. Spearman completed a second psychiatric review
technique based on IME Dr. Moore's assessments (R. at 258-271).  Dr. Spearman
found that Plaintiff had a dysthymic disorder, a panic disorder, and agoraphobia (R. at
261, 263).  Dr. Spearman opined that Plaintiff had a moderate restriction of daily living
activities, moderate difficulties in maintaining social functioning, mild difficulties in
maintaining concentration, persistence or pace, and never had repeated episodes of
deterioration of extended duration (R. at 268).

Dr. Spearman completed a mental RFC assessment on January 24, 2003, at the
request of the SSA (R. at 272-275).  Dr. Spearman found that Plaintiff was not

significantly limited in the understanding and memory category, with the exception that

Plaintiff was moderately limited in his ability to understand and remember detailed

instructions (R. at 272).  Dr. Spearman also found that Plaintiff was no more than

moderately limited in the sustained concentration and persistence category, the social

interaction category and the adaption category (R. at 273).

On January 6, 2003, disability analyst B. Jacobs completed a non-severe

impairment checklist at the request of the SSA (R. at 257).  In it, Jacobs found that

Plaintiff's medical evidence did not show more than a slight abnormality for Plaintiff's

ability to walk, stand, sit, lift, push, pull, reach, carry, handle, see, hear, or speak.  Id.

# Discussion

### Legal Standard of Review:

6.      A court reviewing a denial of disability benefits may not determine *de novo*

whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v.

Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the

Commissioner's determination will only be reversed if it is not supported by substantial

evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.

1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is

evidence that amounts to "more than a mere scintilla," and it has been defined as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971).  Where evidence is deemed susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

9.      This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe

13

impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

10.     While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.     In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff was insured within the meaning of the Act from April 1, 1986, through December 31, 2001 (R. at 25); Plaintiff had no severe impairments before reaching the age of 22 (R. at 26); (2) Beginning on August 1, 1986, Plaintiff had the following severe impairments: panic

14

disorder, agoraphobia, and dysthymia (R. at 26); (3) Plaintiff's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R. at 26); (4) Plaintiff's complaints concerning his limitations are not totally credible (R. at 26); (5) Beginning August 1, 1986, through the date of the ALJ's decision, the Plaintiff had the ability "to perform the exertional demands of work involving simple tasks, simple instructions, few and infrequent changes, minimal decision-making as a requirement of the job, and no more than occasional interaction with peers and supervisors.  Moreover, the claimant has a need to avoid all interaction with the public" (R. at 26); (6) Plaintiff had no relevant past work (R. at 26); (7) Plaintiff is a 'younger individual' with a college education (R. at 26); (8) Plaintiff is the dependent, unmarried, child of a wage earner (R. at 26); (9) Plaintiff has no exertional limitations (R. at 26); (10) Plaintiff has the ability for sedentary work as an assembler, hand packager, inspector, and surveillance system monitor (R. at 26). Ultimately, the ALJ found that Plaintiff was not under a "disability" as defined by the Act, at any time through the date of his decision (R. at 26).

**Plaintiff's Allegations:**

12.     Plaintiff challenges the decision of the ALJ on the basis that it was not supported by substantial evidence.  Specifically, Plaintiff alleges that (1) the ALJ improperly discounted the opinions of treating physicians, Dr. Hare and Dr. Cook; (2) the ALJ erred with respect to Plaintiff's RFC; (3) the ALJ was not able to show that jobs existed in the economy in significant numbers.  Plaintiff also argues that no purpose would be served by remanding.

**Allegation 1: The ALJ Improperly a) Discounted the Opinions of Dr. Cook and Dr. Hare and Failed to give Dr. Cook Controlling Weight and b) Replaced the Opinions of Dr. Cook and Dr. Hare with Dr. Moore and Dr. Spearman:**

a) **The ALJ Erred in Discounting the Opinions of Dr. Cook and Dr. Hare and Failing to Grant Dr. Cook Controlling Weight**

13.     Plaintiff argues that the ALJ improperly discounted the opinions of Dr. Hare and Dr. Cook and improperly denied Dr. Cook controlling weight. [29]  <u>See</u> Plaintiff's Brief, pp. 9-10.  Defendant responds by arguing that the ALJ did in fact follow the opinions of Dr. Hare and Dr. Cook and granted them the proper weight.  <u>See</u> Defendant's Brief, pp. 5-9.

According to the "treating physician's rule,"[30] the ALJ must give controlling weight to the treating physician's opinion when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); <u>see also</u> <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 105 (2d Cir. 2003); <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency

---

[29] Plaintiff does not directly argue that Dr. Hare should be afforded controlling weight, merely that his opinion was "improperly discounted."  <u>See</u> Plaintiff's Brief, pp. 9-10.

[30] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. §§ 404.1527 detailing the weight to be accorded a treating physician's opinion." <u>de Roman v. Barnhart</u>, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Plaintiff argues that the ALJ erred by discounting the opinions of Dr. Cook and Dr. Hare.  With respect to Dr. Cook, the ALJ found that his "opinion [was] generally well supported with the exception that the record fails to support a finding that the claimant cannot handle *any* stress.  The other limitations have been incorporated in the residual functional capacity reached in this decision" (R. at 22) (emphasis in original).  As for Dr. Hare, the ALJ determined that "[h]is identified limitations have also been afforded significant weight and considered in the residual functional capacity that follows."  Id.

A treating physician will be granted controlling weight if the opinion is well supported and not inconsistent with other substantial evidence.  20 C.F.R. § 303.1527(d)(2).  Also, it should be noted that the "the report of a consultative physician may constitute such [substantial] evidence."  Mongeur v. Heckler, 722 F.2d 1033 (2d Cir. 1983) (citing Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981); Perez v. Sec'y of Health, Educ. & Welfare, 622 F.2d 1 (1st Cir. 1980)).

Here, Dr. Hare and Dr. Cook were inconsistent with each other and with other evidence in the record.  For example, Dr. Cook opined that Plaintiff had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors (R. at 276).  However, Dr. Hare opined that Plaintiff had a good ability to follow work rules and use judgment, but a seriously limited ability to relate to co-

17

workers, deal with the public, and interact with supervisors (R. at 288).  Also, while Dr.

Cook found that Plaintiff had a poor or no ability to deal with work stress, Dr. Cook

deemed Plaintiff only seriously limited (R. at 277, 288).  And while Dr. Cook opined that

plaintiff was seriously limited in his ability to maintain attention/concentration, Dr. Hare

found he had a fair ability (R. at 277, 288).  Finally, while Dr. Hare believed Plaintiff had

a fair ability to understand, remember and carry out simple job instructions, Dr. Cook

believed Plaintiff to have a good ability (R. at 277, 288).  Thus, the opinions from Dr.

Cook and Dr. Hare did differ, and they were inconsistent.

Dr. Cook and Dr. Hare were also inconsistent with consulting examining

physician Dr. Moore.  For example, Dr. Cook found that Plaintiff had a fair ability to

relate to co-workers, deal with the public, and interact with supervisors, but Dr. Moore

opined that Plaintiff would have a "great deal of difficulty relating to groups of people"

(R. at 276, 241).  Also, while Dr. Hare found that Plaintiff had a good use of judgment,

Dr. Moore opined that Plaintiff "generally can show poor decision-making abilities (R. at

287, 241).

Moreover, Dr. Cook's finding that Plaintiff could not handle any stress is not

supported by the record.  For example, the ALJ noted that Plaintiff handled his

diagnosis of sarcoidosis in 1993 well (R. at 20).  The ALJ also noted that Dr. Moore, the

consulting examining psychologist, found that while Plaintiff was "easily overwhelmed

by stress," she did not find that Plaintiff could not handle any stress (R. at 22, 241).

Thus, the opinions of both Dr. Hare and Dr. Cook were inconsistent with each other and

other substantial evidence in the record.

### b) The ALJ's Improper Reliance on the Opinions of Dr. Moore and Dr. Spearman

14.     Plaintiff argues that the ALJ improperly replaced the opinions of Dr. Hare and Dr. Cook with consulting examining psychologist, Dr. Moore, and consulting reviewing physician, Dr. Spearman.  However, it is clear from the record that the ALJ properly incorporated all four doctors' opinions into his RFC.

As previously stated, the ALJ's decision to not afford Dr. Cook controlling weight was proper.  Also, despite not affording controlling weight to either treating physician, the ALJ adopted many of their findings, specifically granted Dr. Hare significant weight, and appears to have granted Dr. Cook a similar weight.[31]

As for the opinions of Dr. Spearman, the ALJ granted her significant weight, as her findings were "well supported by the evidence and not inconsistent with the record as a whole" (R. at 21).  The ALJ also granted Dr. Moore's findings significant weight because they were "well supported by the claimant's symptoms and level of function . . . [and] consistent with the medical reviewer findings that the claimant has several moderate limitations but no marked limitations in the ability to carry out the mental functions of work" (R. at 22).

There is no evidence to suggest that the ALJ improperly replaced the opinions of Dr. Hare and Dr. Cook with the findings of Dr. Moore and Dr. Spearman.  It is clear from the decision that the ALJ incorporated all four doctors appropriately into the RFC. Notably, Plaintiff does not cite to any evidence in either the record or the ALJ's decision

---

[31] The ALJ never specifically stated what weight he afforded Dr. Cook.  However, the ALJ discussed Dr. Cook's opinions of Plaintiff first, and Dr. Hare's opinions second, but in the same paragraph (R. at 22).  In regards to Dr. Hare, the ALJ stated that his findings "have *also* been afforded significant weight." Id. (emphasis added).  Thus, it can be inferred that the ALJ intended to afford Dr. Cook significant weight and that the omission was an oversight.  Id.

to support this claim other than to note that the ALJ afforded both Dr. Moore and Dr.

Spearman significant weight.

**Allegation 2: The ALJ Erred by a) Failure to Include Plaintiff's Back Pain in the RFC, b) Misinterpretation of the Facts, and c) Failure to Consider the Side Effects of Plaintiff's Medication:**

### a) The ALJ Erred in Failing to Include Plaintiff's Back Pain in the RFC

15.     In order to determine a claimant's RFC, the ALJ must assess "all of the relevant

medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  Also, the ALJ must consider

the claimant's "ability to meet the physical, mental, sensory, and other requirements of

work…."  Id. § 404.1545(a)(4).  Plaintiff argues that the ALJ failed to include Plaintiff's

back pain and his corresponding limitations in the RFC.  See Plaintiff's Brief, p. 12.  In

response, Defendant argues that Plaintiff's back pain is not limiting.  See Defendant's

Brief, p. 9.

With regard to Plaintiff's back pain the ALJ found that:

[m]edical records from … Dr. Thomas Cook, document that the claimant had some low back pain that was diagnosed as left sciatica… He had physical therapy and began taking the prescription anti-inflammatory, Relafen.  He reported significant improvement and was able to discontinue all treatment other than his own exercise program.  As this impairment responded to treatment quickly and left Mr. Kotasek with no significant limitations, the claimant's sciatica is a nonsevere impairment, as defined by the regulations (R. at 18).

Here, there is substantial evidence to support the ALJ's finding.  The only

evidence the Court could find supporting Plaintiff's claim of an exertional limitation is the

report from the internal medicine consulting examining physician, Dr. Datta.[32]  Dr. Datta

---

[32] Plaintiff did not cite to any evidence in the record.

found that Plaintiff had no exertional limitations except for "[m]ild restrictions for heavy lifting and carrying" (R. at 233).

However, there is much greater evidence in support of the ALJ's finding of "no exertional limitations" (R. at 26).  On July 31, 2001, Dr. Cook noted that Plaintiff had three weeks of physical therapy for his left sciatica and that it improved with Relafen (R. at 160).  Notably, Dr. Cook stated that Plaintiff was no longer in physical therapy and was continuing with the exercises on his own.  Id.  Also, according to Plaintiff, he was not taking Relafen, or any other anti-inflammatory, around March 2003[33] (R. at 110).

In Plaintiff's disability report he states that he has a back injury limiting his ability to work (R. at 73). However, when listing his employment, Plaintiff stated that his "reasons for leaving any/all employment have been related to [his] anxiety/panic disorder, phobias, and or depression, either by single incident or accumulation" and made no reference whatsoever to back pain (R. at 82). Also, in a second disability report, dated October 25, 2002, Plaintiff "stated [that] he left all his jobs in the past because he could not handle working with people or be task oriented in a work environment" (R. at 100).  Again, Plaintiff did not mention his back pain as a hindrance to employment.  Also, Plaintiff submitted a three page single space typed letter in connection with the disability report in which he explained his life experiences and why he was applying for disability (R. at 85-87).  Notably, at no point did Plaintiff mention back pain in this letter and focused entirely on the limitations caused by his mental problems (R. at 85-87).

---

[33] Plaintiff listed the drugs he was currently taking in a document titled "Claimant's Statement When Request for Hearing is Filed and the Issue is Disability" (R. at 110).  While this document is undated, the record indicates that Plaintiff filed his request for a hearing on March 17, 2003 (R. at 42).

Finally, in the non-severe impairment checklist from disability analyst, Jacobs, dated January 6, 2003.  Jacobs stated that plaintiff did not have more than a slight abnormality for lifting, pushing, pulling, reaching, carrying, or handling (R. at 257).

### b)  The ALJ Erred by Misinterpreting the Facts of the Case

16.    Plaintiff argues that the ALJ misinterpreted the facts by ignoring substantial evidence in assessing Plaintiff's RFC.  See Plaintiff's Brief, pp. 12-14.  However, the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

The ALJ made the following findings for Plaintiff's RFC, beginning August 1, 1986:  Plaintiff has the ability "to perform the exertional demands of work involving simple tasks, simple instruction, few and infrequent changes, minimal decision-making as a requirement of the job, and no more than occasional interaction with peers and supervisors.  Moreover, the claimant has a need to avoid all interaction with the public" (R. at 26).

This finding is supported by substantial evidence from Plaintiff's treating physicians, Dr. Cook and Dr. Hare.  First, Doctor Cook found that Plaintiff had a good ability to understand, remember and carry out simple instructions, and Dr. Hare found that Plaintiff had a fair ability (R. at 277, 288).  Next, Dr. Cook found that Plaintiff had a fair use of judgment and Dr. Hare found that Plaintiff had a good use of judgment (R. at 276, 287).  Dr. Cook found that Plaintiff had a fair ability to relate to co-workers, deal with the public, and interact with supervisors (R. at 276).  Dr. Hare found that Plaintiff was seriously limited in his ability to relate to co-workers, deal with the public, and interact with supervisors (R. at 287).

Dr. Hare and Dr. Cook also made determinations on Plaintiff's ability to deal with work stress (R. at 277, 288).  Dr. Cook found that Plaintiff had a poor ability, or no ability, to deal with work stress, and Dr. Hare found that Plaintiff's ability to deal with work stress was seriously limited (R. at 277, 288).  As the ALJ noted, and Dr. Hare concurred, Plaintiff's stress stems from his social phobias (R. at 22, 288-289).  Thus, the ALJ incorporated this in his RFC and included a requirement that Plaintiff have a limited interaction with peers and supervisors and no contact with the public.  Id.

The ALJ's RFC finding is also supported by substantial evidence from consulting examining physician, Dr. Moore, and reviewing physician, Dr. Spearman.  Dr. Moore found that Plaintiff "could follow and understand simple directions and instructions... [and] perform simple tasks under supervision … [but] has [a] great deal of difficulty relating with groups of people" (R. at 240).  Dr. Moore also found that Plaintiff "generally show[ed] an intact memory and concentration."  Id.  As for Dr. Spearman, in her mental RFC assessment, she found that Plaintiff was not significantly limited in his ability to understand, remember, and carry out very short and simple instructions, to make simple work-related decisions, but was moderately limited in his ability to respond appropriately to changes in the work setting and to interact appropriately with the general public (R. at 272-273).

Plaintiff also argues that the ALJ erred with regard to the RFC by misinterpreting the facts and putting too much of an emphasis on Plaintiff's completion of college, his ability to 'nearly' support himself as a painter, and the positive effect that the medications had on him.  See Plaintiff's Brief, pp. 12-14.  However, all these arguments are without merit.

First, the ALJ discussed Plaintiff's completion of a four year degree when determining whether Plaintiff had a severe impairment before reaching the age of twenty-two as required for Plaintiff's Child Insurance Benefits claim (R. at 19).  As the ALJ did not find a severe impairment for Plaintiff before his twenty-second birthday, there is no RFC for this time period.[34]  Therefore, the ALJ did not consider Plaintiff's completion of college in his RFC analysis as the RFC was created for a time period after Plaintiff completed college and turned twenty-two.

Second, the ALJ only twice mentioned in his decision the fact that Plaintiff was 'nearly' able to support himself through painting (R. at 19, 21).  The ALJ first made a passing reference to it when he laid out Plaintiff's medical history and discussed Dr. Chisdak's treatment notes concerning Plaintiff's mental impairments (R. at 19). However, the only discussion of Plaintiff's ability to 'nearly' support himself arose in connection with the ALJ's analysis of Plaintiff's credibility (R. at 21).  In that instance, the ALJ stated that "the medical records document that [Plaintiff] is an artist who was successfully painting and selling enough that his treating source noted that he could nearly support himself through his art.  In spite of this, the claimant has never reported profits from his self-employment on his tax return."  Id.  Thus, it is clear from the record that the ALJ only made use of Dr. Chisdak's statement to determine Plaintiff's credibility, and there is no indication that the ALJ relied improperly, or at all, on this statement when determining Plaintiff's RFC.

Third, Plaintiff asserts that the ALJ erred in stating that Plaintiff was symptom free.  However, the Court has been unable to find such an all inclusive statement by the

---

[34] Plaintiff is not challenging the ALJ's step 2 analysis for the time period before Plaintiff turned twenty-two.

ALJ.  Notably, Plaintiff failed to cite to either the record or the ALJ's decision to indicate to which statement Plaintiff was referring.  The only reference to being symptom free that the Court could find was a statement in the ALJ's decision that "[i]n August 1989, the claimant was symptom free on Xanax" (R. at 20).  Although it is unclear from his decision on what evidence the ALJ was basing this statement,[35] it is apparent from the record that the ALJ considered all relevant evidence, as required by 20 C.F.R. § 404.1545(a)(3).  Despite the ALJ's one statement indicating Plaintiff had a one month symptom free period, he stated numerous times throughout his decision that Plaintiff was not symptom free, but controlling his impairments well through medication.  For example, the ALJ noted that Plaintiff was responding well to medication in 1984, his anxiety and depressive disorders were well controlled in 1997, his depression was well controlled in 2001, his depression was under better control in 2003 and 2004, and the medical record as a whole indicated a good response to medication (R. at 19, 20, 21).  Thus, the ALJ's thorough decision indicates that he considered all relevant medical evidence and did not base his finding on this one statement concerning Plaintiff's symptoms in August 1989.

Finally, Plaintiff argues that while the medications have helped lessen the severity of the symptoms from Plaintiff's mental impairments, they have never completely removed them.  However, this argument is unavailing, as "disability requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d 1545,

---

[35] The ALJ cites to Exhibit 4F, Dr. Hare's treatment notes (R. at 20).  Plaintiff only saw Dr. Hare once in August 1989, on the 8th (R. at 216).  However, treatment notes from that date indicate that Dr. Hare and Plaintiff discussed the need to decrease Plaintiff's medications, that Plaintiff was doing better and seemed to enjoy his jobs, he was still much dependent on medications, and he was experiencing anticipatory anxiety.  Id.  Thus, there was no statement that Plaintiff was symptom free.

1552 (2d Cir. 1982).  The ALJ was able to incorporate Plaintiff's remaining symptoms into the RFC.  The ALJ "accommodate[d] the claimant's longstanding difficulty with anxiety and dysthymia by addressing their primary manifestations consisting of difficulty with motivation, task completion, and social phobias.  [The RFC] also addresse[d] the most common causes of higher stress in the work place, i.e., dealing with changes, the public and decision-making" (R. at 22).  Thus, the record clearly indicates that the ALJ was not acting under the impression that Plaintiff's medications made him symptom free.

### c)  The ALJ Erred in Failing to Consider the Side Effects from Plaintiff's Medications

17.    Plaintiff's final argument regarding the ALJ's RFC analysis is that he failed to consider Plaintiff's side effects from his medications.  See Plaintiff's Brief, p. 13.

"Social Security regulations require an adjudicator to determine the extent to which a claimant's symptom's affect the claimant's functional capacity."  Osorio v. Barnhart, No. 04 Civ. 7515, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  Here, in Plaintiff's credibility analysis, the ALJ found that Plaintiff was "less than fully credible." [36] With regard to the side effects of Plaintiff's medications, the ALJ found that Plaintiff "has reported infrequent side effects of his medications but, when reported, his treating sources have adjusted his medications without losing the efficacy of the prescriptions" (R. at 21). There is substantial evidence in the record to support this statement.

---

[36] Plaintiff does not raise a credibility argument.  Therefore, the Plaintiff's credibility is not discussed and the ALJ did not err in finding Plaintiff "less than fully credible" (R. at 21).

Plaintiff's brief simply argues that the ALJ did not "mention the significant side effect" of Plaintiff's medication, but Plaintiff did not state what that significant side effect was.  See Plaintiff's Brief, p. 13.  Plaintiff also failed to cite to a source in either the record or the ALJ's decision that would indicate to which side effect he was referring. Id.  Plaintiff argues that if the ALJ considered this significant side effect, it "would further effect [sic] [Plaintiff's] ability to perform work related activities and in fact the ultimate RFC determination."  Id.

Plaintiff identified two side effects from his medication at his hearing, and these side effects were feeling tired or drowsy and "sexual side effects" (R. at 308).  Plaintiff also stated a third side effect, headaches, in his disability report (R. at 90).  Although Plaintiff noted feeling tired as one drawback to his medication in his letter to the SSA, and did not mention sexual side effects or the headaches, it is evident from the record that Plaintiff's main complaint has been the sexual side effects (R. at 86).  In fact, this Court can find no evidence of either a drowsy or headache side effect resulting from his medication except for Plaintiff's own statement at his hearing and in his disability report, which contained Plaintiff's letter to the SSA (R. at 308, 86, 90).  Notably, the Court could not find one complaint of drowsiness or headaches from Dr. Hare's treatment notes, which encompassed nearly twenty years of psychological treatment (R. at 164-229, 279-286).  In fact, the Court could find no evidence of Plaintiff's complaints of headaches or feeling drowsy in any of Plaintiff's medical records.  Therefore, as the ALJ properly found Plaintiff to be "less than fully credible," and there is no objective medical evidence supporting Plaintiff's claim of a drowsy or headache side effect, Plaintiff's argument is without merit (R. at 21).  See Peguero v. Barnhart, No. 05 Civ 5799, 2006

27

WL 2570607, at *4 (S.D.N.Y. Sept. 6, 2006) (finding that the ALJ's assessment of

Plaintiff's limitations was proper, in part because, despite Plaintiff's subjective

complaints of side effects, "none of the medical records submitted by [Plaintiff]

indicate[d] that he was suffering from side-effects of the medications he was taking").

The only side effect that this Court could find corroborating medical evidence for

was Plaintiff's sexual side effects.  On April 30, 2001, Dr. Hare discussed changing

Plaintiff's medication to Serzone because of the sexual side effects from the medication

he was currently taking (R. at 182).  On July 30, 2001, Plaintiff stated to Dr. Cook that

he had no side effects[37] when taking 50 mg. of Serzone, but that he still felt improved

(R. at 160).    On January 21, 2002, Plaintiff again complained of sexual side effects

from his medication and Dr. Hare suggested a trial of Wellbutrin (R. at 175).  On

February 22, 2002, Plaintiff told Dr. Cook that he wanted to start Wellbutrin "to cut down

on the decreased libido [and] sexual side effects of the Zoloft medication" (R. at 158).

Thus, the ALJ was correct in finding that when Plaintiff told Dr. Hare and Dr. Cook of his

side effects, Plaintiff's "treating sources have adjusted his medications without losing

the efficacy of the prescriptions" (R. at 21).  However, as the Court can find no

conceivable way in which sexual side effects would impact Plaintiff's RFC, this

argument is also without merit.

**Allegation 3: The ALJ Erred by a) Failing to Correctly Analyze Plaintiff's Limitations, b) Failing to Precisely Explain Plaintiff's Limitations to the Vocational Expert ("VE"), c) Following the DOT, Which is Inaccurate and Out of Date, and d) Ignoring the Findings of the Rebuttal VE:**

---

[37] Dr. Cook does not indicate what side effects Plaintiff is referring to, but as Dr. Hare suggested changing Plaintiff's medications to Serzone in response to the sexual side effects, it is inferred that this is the side effect Dr. Cook mentions (R. at 182).

### a) The ALJ Erred by Failing to Correctly Analyze Plaintiff's Limitations

18.     Plaintiff argues that the ALJ "chose to paint a rosier and slightly misplaced picture of the Plaintiff's situation," and therefore the hypothetical given to the VE was necessarily flawed.  See Plaintiff's Brief, p. 15.  Although Plaintiff's argument is not clear, the Court infers that Plaintiff is ultimately arguing that the ALJ erred in Plaintiff's RFC determination.  As that argument was discussed previously, and Plaintiff's RFC was found to be supported by substantial evidence, it will not be analyzed here.  See, Allegation 2.


### b) The ALJ Erred by Failing to Precisely Explain Plaintiff's Limitations to the VE

19.     Plaintiff argues that the ALJ "failed to precisely explain the Plaintiff's impairments in posing the hypothetical question to the vocational expert" and therefore the VE's testimony should not be considered.  See Plaintiff's Brief, p. 15.  Defendant responds by arguing that the hypothetical was supported by substantial evidence.  See Defendant's Brief, p. 11.

        Whether a hypothetical given to the VE is appropriate depends on whether the hypothetical fully encompasses Plaintiff's physical and mental limitations.  Magee v. Astrue, No. 5:05-CV-413, 2008 WL 4186336, at *20 (N.D.N.Y. Sept. 9, 2008) (citing Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 799 (6th Cir. 1987)).  "If the factors set forth in the hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability."  Id.

The ALJ made the following finding for Plaintiff's RFC: "retained the residual functional capacity to perform the exertional demands of work involving simple tasks, simple instructions, few and infrequent changes, minimal decision-making as a requirement of the job, and no more than occasional interaction with peers and supervisors.  Moreover, the claimant has a need to avoid all interaction with the public" (R. at 26).

At the hearing, on March 18, 2004, the ALJ posed the following hypothetical to the VE:

> assume this is a younger individual, a high school education, and no significant past work. … assume this individual could perform work on any exertional level, but would require only understanding and remembering and carrying out simple instructions and performing simple tasks; where there would be few or infrequent changes in the work; where there would be minimal decision-making on the part of the individual as part of the job; and where there'd be no public interaction as part of the job; and where there'd be only occasional interaction with peers or supervisors … (R. at 313).

This Court can find no discrepancies between the ALJ's RFC determination and the limitations the ALJ gave to the VE in the hypothetical.[38]  As the Court has previously found that the ALJ's RFC determination was supported by substantial evidence, and there are no discrepancies between the RFC and the hypothetical, the hypothetical posed to the VE is necessarily supported by substantial evidence.  See Allegation 2.

### c)  The ALJ Erred by Following the DOT, Which is Inaccurate and Out of Date

---

[38] In the ALJ's decision, as part of his findings, he stated that Plaintiff had a college education, but in the hypothetical posed to the VE, he stated that Plaintiff had a high school education (R. at 26, 313).  This Court does not find error in the ALJ's findings as it is unlikely that Plaintiff could have received a college education unless he first had a high school diploma. Moreover, by limiting the education level, it could be argued that it favored Plaintiff by limiting the jobs available to him.

20.     Plaintiff argues that the DOT is both out of date and applies an incorrect methodology that "artificially inflates the number of jobs."  See Plaintiff's Brief, p. 16. Defendant responds by arguing that the DOT is the standard by which jobs are identified.  See Defendant's Brief, p. 12.

As for Plaintiff's argument that the DOT is out of date, the ALJ was "not in total disagreement … as common sense suggests that changes in technology in the last 20 years have altered, eliminated, and produced many jobs since the DOT originated" (R. at 24).  However, as the ALJ noted, "the DOT remains the standard by which the jobs are identified," (R. at 34); SSR 00-4p, 2000 WL 1898704, *2.  Therefore, Plaintiff's argument is unconvincing.

As for Plaintiff's argument that the DOT reflects an incorrect methodology, the ALJ kept the record open for three months to allow Plaintiff to supplement his evidence to support such a contention (R. at 24, 117).  The only evidence Plaintiff submitted was a statement by Plaintiff's rebuttal VE stating that he believed, among other things, that "it is not possible to determine the approximate number of jobs that exist in the national and regional economy for a particular DOT code … [and] labor market statistics do not provide an accurate picture of the current labor market" (R. at 123).  However, the ALJ is instructed by the Commissioner's regulations and subsequent ruling to follow the DOT in identifying jobs.  See 20 C.F.R. §§ 404.1566(d) and 416,966(d); SSR 00-4p, 2000 WL 1898704, *2.  As Plaintiff did not present any contradicting evidence, nor did he cite to any relevant case law or statute in his brief, Plaintiff's argument is unavailing.

### d)  The ALJ Erred by Ignoring the Findings of the Rebuttal VE

21.     Plaintiff argues that the ALJ improperly ignored the findings of Plaintiff's rebuttal

VE.  <u>See</u> Plaintiff's Brief, p. 16.  However, as the ALJ noted, the RFC that the ALJ found

was not as limiting as those presented by Plaintiff to the rebuttal VE (R. at 24).  The ALJ

was not required to simply accept the opinion of Plaintiff's VE concerning what

limitations Plaintiff's impairments might impose.  Decisions about such matters are

reserved to the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.1527(e) and 416.927(e).  In this

case, the record contains substantial evidence to support the ALJ's determination that

Plaintiff was not under a disability, as defined by the Act, at any time during the time

frame relevant to his claim.    Thus, there was no need to consider the more limiting

hypotheticals posed by Plaintiff's rebuttal VE.  <u>See</u> <u>Dumas v. Schweiker</u>, 712 F.2d 1545,

1554 n.4 (2d Cir. 1983). ("Because there was substantial evidence to support the

Secretary's conclusion that Dumas retained the residual functional capacity for

sedentary work, the ALJ rightfully removed that issue from the vocational expert's

consideration.  The vocational expert is just that, a vocational expert.  The ALJ is

responsible for determining, based on all the evidence, the claimant's physical

capabilities. . . .").


### Allegation 4: There is No Justification for Remand

22.     Plaintiff's final argument is that there is no justification for remand as reversal is

appropriate.  <u>See</u> Plaintiff's Brief, pp. 16-17.  Defendant responds by arguing that there

is also no justification for remand because the ALJ's decision was supported by

substantial evidence.  <u>See</u> Defendant's Brief, p 13.

According to 42 U.S.C. § 305(g), "[t]he court shall have power to enter … a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  As the Court recommends that the ALJ's decision is supported by substantial evidence, there is no justification for either remand or reversal.  Therefore, it is recommended that the ALJ's decision be upheld.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be GRANTED; Plaintiff's cross motion for judgment on the pleadings should be DENIED.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

Syracuse, New York

DATED:        March 5, 2009

**ORDERS**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Syracuse, New York
DATED:      March 5, 2009